IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered) |
| KENNETH R. GREATHOUSE; STUART ROSE; AND LLOYD GLENN;<br><br>Plaintiffs,<br><br>v.<br><br>MALLINCKRODT PHARMACEUTICALS IRELAND LIMITED; MALLINCKRODT ARD LLC; and DOES 1-50;<br><br>Defendants. | Adv. Pro. No. 21-_____(JTD) |

**COMPLAINT FOR DECLARATORY JUDGMENT, ACCOUNTING, CONSTRUCTIVE TRUST, CONVERSION, AND UNJUST ENRICHMENT**

Plaintiffs KENNETH R. GREATHOUSE, STUART ROSE, and LLOYD GLENN (collectively "Plaintiffs" or the "Glenridge Principals"), hereby submit this *Complaint for Declaratory Judgment, Accounting, Constructive Trust, Conversion, and Unjust Enrichment*, and in support thereof, respectfully allege, as follows:

**NATURE OF THE ACTION**

1. Plaintiffs commence this adversary proceeding pursuant to section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(1), 7001(7) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking a declaratory judgment, accounting,

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

1

constructive trust, conversion and unjust enrichment against defendants, Mallinckrodt Pharmaceuticals Ireland Limited, Malllinckrodt ARD LLC, and DOES 1-50.

2. Plaintiffs represent that Defendants wrongfully possessed, exercised control or dominion over and/or withheld certain Ongoing Royalty Payments (as defined herein) from Plaintiffs and that Defendants have unlawfully converted such Ongoing Royalty Payments for Defendant's use, profit, benefit and/or gain. As a direct and proximate result of Defendants' wrongful acts and omissions, Defendants have been unjustly enriched to the detriment of Plaintiffs and therefore a constructive trust must be imposed upon the Ongoing Royalty Payments, together with applicable interest, to prevent the unjust enrichment of Defendants for Plaintiffs' loss of use and the value of the Ongoing Royalty Payments.

3. Accordingly, Plaintiffs hereby demand a declaratory judgment against each of the Defendants with regard to their rights, claims, title and interests arising under or related to the Ongoing Royalty Payments together with an accounting, and damages in an amount to be determined at trial, together with interest, attorneys' fees, and the costs incurred in this action.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

5. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

6. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders of judgments consistent with Article III of the United States Constitution.

7. This adversary proceeding is initiated under Bankruptcy Rules 7001(1), 7001(7) and 7001(9), and the relief requested herein may be ordered pursuant to section 105(a).

## THE PARTIES

8. Plaintiff KENNETH R. GREATHOUSE ("Greathouse") is, and at all relevant times herein was, an individual residing in Los Altos, California.

9. Plaintiff STUART ROSE ("Dr. Rose") is, and at all relevant times herein was, an individual residing in Albuquerque, New Mexico.

10. Plaintiff LLOYD GLENN ("Glenn") is, and at all relevant times herein was, an individual residing in Mesa, Arizona.

11. Defendant MALLINCKRODT PHARMACEUTICALS IRELAND LIMITED ("MPIL") is a pharmaceutical company formed in the Republic of Ireland with a registered mailing address of 675 McDonnell Boulevard, Hazelwood, MO 63042.

12. Defendant MALLINCKRODT ARD LLC ("ARD") is a California Limited Liability Company with its principal place of business at 1425 U.S. Route 206, Bedminster, New Jersey, 07921.

13. MPIL and ARD are subsidiaries of Mallinckrodt plc, which is the lead Debtor in these bankruptcy cases, an Irish public limited company, and the publicly traded, ultimate parent of the Mallinckrodt global enterprise headquartered in Dublin, Ireland.

14. Mallinckrodt plc, along with MPIL and ARD, filed voluntary petitions under Chapter 11 of the Bankruptcy Code on October 12, 2020, currently pending as jointly administered Case No. 20-12522, before the Honorable John T. Dorsey in the United States Bankruptcy Court for the District of Delaware.

15. Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these DOE defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs

are informed and believe and thereupon allege that each defendant designated as a DOE has, or claims to have, some interest in or to the Ongoing Royalty Payments, hereinafter described. Plaintiffs allege, on information and belief, that at all times herein defendants, and each of them, were the agents, servants, and representatives of each of the remaining defendants and acted within the scope and course of such agency and representation. Plaintiffs shall hereinafter collectively refer to MPIL, ARD, and DOES 1 through 50, as "Defendants."

## FACTUAL BACKGROUND

**A.     Acthar Gel**

16.     Acthar Gel is a naturally-derived formulation of adrenocorticotropic hormones ("ACTH") used for a variety of disorders having an inflammatory component.

17.     Acthar currently is FDA-approved in the U.S. for the treatment of a number of serious conditions including but not limited to acute exacerbations of multiple sclerosis in adults, treatment of infantile spasm, and as a treatment for nephrotic syndrome. The manufacturing process for Acthar is complex. ACTH alone, as a pure material, does not treat the therapeutic indications for which Acthar is approved. In addition to ACTH, Acthar contains an assortment of smaller peptides that have not been fully characterized but are believed to play a significant role in the efficacy and safety of Acthar. ACTH is extracted and purified from swine pituitary glands, and the quantity of ACTH in pituitary glands varies. In addition, the manufacturing process consists of numerous steps that are manual, time consuming, and result in varying product yields and potencies.

18.     In the late 1990s, Acthar was unprofitable for its owner, Aventis Pharmaceuticals Inc. ("Aventis"). Aventis had disclosed to the FDA that it was losing between $7 million to $8 million per year on the drug. Aventis had formally notified the FDA that it was discontinuing production of the drug. The Glenridge Principals learned in 1999 that Aventis was pursuing the divestiture of Acthar. The Glenridge Principals understood that the abandonment of Acthar would lead to devastating results for

4

patients who depended on the drug. The Glenridge Principals also realized that Acthar possessed enormous untapped economic potential if someone could develop a manufacturing, regulatory and pricing strategy that overcame the unique challenges described below. Time has proven that the Glenridge Principals were correct.

**B.     The Plaintiffs' Backgrounds and the Glenridge Partnership**

19.     Kenneth Greathouse has been working in the pharmaceutical industry since 1975. In 1995, he became the general manager of a mail order pharmacy business, owned by Athena Neurosciences, which delivered prescriptions through the mail to patients who had neurological illnesses. While working in that role, he negotiated an arrangement between Athena and Rhône-Poulenc Rorer, the company that later became Aventis, whereby the mail order pharmacy he ran became the distribution mechanism for Acthar to be dispensed to patients who were in a patient assistance program administered by NORD, the National Organization for Rare Disorders.

20.     Before a company could profitably market and sell Acthar, it was critical to gain the cooperation of NORD. Through his work at Athena, Greathouse became intimately familiar with not only Aventis and Acthar, but also with NORD and its management, with whom he developed close ties. Greathouse became very knowledgeable about the complex manufacturing issues surrounding Acthar, as well as its unique FDA regulatory challenges.

21.     Stuart Rose is a Ph.D. chemist who has been involved in various roles in the pharmaceutical industry since the early 1970s. He has been responsible for manufacturing processes that have included fermentation, separation and isolation of desired material, and refining and purification of that material. He has been responsible for the manufacturing and testing of various biological products as well as animal testing facilities to assure products were made in compliance with FDA regulations. He also has been responsible for the manufacturing of "sterile injectables," much like Acthar.

22. During his career, Dr. Rose frequently interacted with the FDA and gained specialized experience, knowledge and contacts with regard to the FDA. Because of his unusual breadth of background, Dr. Rose was uniquely positioned to devise an approach to manufacture and test the complex series of processes necessary to make Acthar. Given the complexity of the manufacturing process, it was critical to ensure that Acthar was manufactured in accordance with applicable FDA regulations following a divestiture from Aventis.

23. Lloyd Glenn has been involved in various sales and marketing positions in the pharmaceutical industry since 1982. While with Allergan Pharmaceuticals, Lloyd had broad responsibilities including the integration and commercialization of Botox® (Botulinum Toxin Type A). Botox is a neurotoxin protein which is also a biologic produced by Clostridium botulinum bacteria. Specific responsibilities included a manufacturing site transfer, the construction of a new manufacturing facility approved for biologics, commercialization of Botox and interacting with several patient advocacy groups with various debilitating rare diseases. As Mr. Glenn worked closely with the various patient advocacy groups, he developed a strong relationship with NORD and served on both the Board of Directors and the Corporate Council. Mr. Glenn was hired by Athena Neurosciences to assist in the development of their biologic product, Botulinum Toxin Type B. With the responsibilities of identifying new product opportunities and the commercialization of products, he saw the significant sales potential of Achtar Gel and considered potential acquisition or marketing license opportunities related to Acthar Gel.

24. Along with Mr. Glenn, Mr. Greathouse formed a limited liability company known as Glenridge Pharmaceuticals, LLC ("Glenridge") in 1999. By January 2000, Dr. Rose joined the Glenridge partnership. In February 2000, Greathouse, Glenn and Rose signed a Memorandum of Understanding formalizing the partnership and limited liability company.

### C. Glenridge Identifies and Pursues the Acthar Opportunity for Itself

25. One of the express purposes for forming Glenridge was to pursue the acquisition of Acthar from the drug's then-owner, Aventis Pharmaceuticals. Based on his prior work with NORD and his ongoing close relationship with NORD's senior executives, Greathouse became aware that Aventis was interested in a divestiture of Acthar. He further realized that NORD could play a key role in helping to convince both Aventis and the FDA that Glenridge would be a credible and sound choice for the divestiture of Acthar.

### D. Glenridge Undertakes Substantial Work in Furtherance of the Transaction With Aventis

26. Glenridge contacted Aventis in December 1999 to inquire about acquiring Acthar. In early 2000, Glenridge and Aventis executed a "Confidential Disclosure Agreement ("CDA")". Glenridge also began working with NORD. For example, Glenridge conducted a conference call with the President of NORD to discuss the implications to NORD of the transfer of Acthar from Aventis to Glenridge. Glenridge held a number of additional meetings with NORD during that time to obtain its support and prepare the way for a smooth transition in ownership of Acthar. Glenridge had significant contacts, experience and expertise in working with the FDA. Those contacts, experience and expertise were critical to Glenridge's ability to conceive of a regulatory strategy by which Glenridge, and later Questcor Pharmaceuticals, Inc. ("Questcor"), could obtain FDA approval of the divestiture of Acthar from Aventis and the successful transfer of the manufacturing processes for Acthar to third-party contract manufacturers. Glenridge identified the regulatory and manufacturing issues that would be critical to effecting a manufacturing site change for Acthar that would be acceptable to the FDA. Glenridge also identified potential contract manufacturers that would be willing and able to take on various production and testing steps required for Acthar. This information and analysis was later made available to Questcor. Glenridge made a two-day site visit to Kankakee, Illinois to inspect the Aventis manufacturing facility for Acthar and to discuss the site transfer logistics with key Aventis manufacturing personnel.

### E. Glenridge Makes a Proposal for Acthar and Obtains an Agreement in Principle

27. Glenridge made a formal proposal to Aventis for the acquisition of Acthar in mid-2000. When Glenridge made that proposal, Greathouse did not know whether Aventis would accept it or whether a deal between Glenridge and Aventis was even possible.

28. Among other terms, the proposal called for Glenridge to pay Aventis $100,000 and for Aventis to transfer to Glenridge all rights to Acthar including ownership of the active New Drug Application ("NDA") and all prior NDAs, and all specialized equipment used in the manufacturing of the raw material for Acthar.

29. Aventis sent confidential data to Glenridge pursuant to the parties' CDA. Glenridge analyzed the confidential data received, combined that with other information that Glenridge possessed and had obtained, and applied its prior market knowledge to ascertain a successful pricing strategy for Acthar that would allow the drug to be manufactured and sold on terms that were not only profitable, but acceptable to both the FDA and to NORD, and that would assure the continuing supply of the product to patients who needed it. Glenridge later made this information and analysis available to Questcor.

30. In 2000, Aventis accepted Glenridge's proposal, writing that "in principle I think we have a deal but there are a number of points in your proposal that will need to be clarified in the Letter of Intent/Agreement."

### F. Greathouse Joins Questcor and Glenridge Offers the Acthar Opportunity to Questcor for Consideration

31. In April 2000, Questcor approached Greathouse about an employment opportunity. Before knowing whether Aventis would even accept a formal proposal from Glenridge or whether a deal between Glenridge and Aventis was even possible, Greathouse signed an offer of employment with Questcor. Greathouse began his employment with Questcor, becoming a senior employee of Questcor only long after Glenridge had initiated negotiations with Aventis.

32. Once it became clear that Aventis was willing to proceed with a deal with Glenridge, Greathouse had to choose whether to resign his recently-begun employment with Questcor, or to continue working for Questcor and have Glenridge offer the Acthar deal to Questcor for consideration. Greathouse discussed the issue with his Glenridge partners, and they chose the latter option. Glenridge expected that if Questcor should decline, one of the three Glenridge partners would likely quit his current position and devote full time to trying to establish Glenridge as the company to acquire, manufacture and market Acthar.

33. In 2000, with approval from Dr. Rose and Glenn, Greathouse approached Charles Casamento, Questcor's then-CEO, about whether Questcor would be interested in acquiring Acthar from Aventis in place of Glenridge. Prior to that meeting, Mr. Casamento had never heard of Acthar.

34. During that meeting, Greathouse fully explained to Mr. Casamento his role with Glenridge and the work that Glenridge had performed to date vis-à-vis Aventis and Acthar, and what work remained to be done to finalize the acquisition of Acthar. Greathouse and Mr. Casamento also discussed that, if Questcor was not interested in trying to obtain Acthar and providing consideration to Glenridge, then Greathouse would have to seriously consider terminating his employment with Questcor so that Glenridge could obtain Acthar for itself. Mr. Casamento concedes that he had a concern "in the back of his mind" that Greathouse "might very well" leave Questcor to pursue the Acthar opportunity.

35. During the meeting on or about July 19, 2000, Greathouse and Mr. Casamento agreed that in exchange for Greathouse suggesting to Aventis that Questcor be allowed to substitute in for Glenridge in the deal that Glenridge and Aventis had already negotiated, and should Questcor consummate a deal with Aventis, Questcor would pay consideration to Glenridge.

**G. Glenridge Arranges to Transfer the Acthar Opportunity to Questcor**

36. As agreed in the meeting held on or about July 19, 2000 between Greathouse and Mr. Casamento, Greathouse asked Aventis on July 20, 2000 if Questcor could substitute for Glenridge on

9

the deal for Acthar "on essentially the same terms proposed earlier by Glenridge." Glenridge proposed to Aventis that "any consideration due Glenridge, related to an eventual Acthar transaction, will be the sole responsibility of Questcor."

37. On July 21, 2000, Aventis' representative responded "unofficially" that "I see no problem in a switch to Questcor." Shortly thereafter, Aventis' representative gave Questcor official approval from Aventis to continue negotiating the details of the deal with Questcor in place of Glenridge.

38. Working in daily consultation with Mr. Casamento, Greathouse took the lead role in negotiating and managing the acquisition of Acthar from Aventis on behalf of Questcor. The negotiation between Questcor and Aventis proceeded on the terms previously negotiated between Glenridge and Aventis. Aventis confirmed that because of the work already performed between Glenridge and Aventis, "there will be no need to repeat any of the work" should Questcor move forward with attempting to complete a deal. Questcor agreed that had Questcor attempted to structure a deal with Aventis without the benefit of Glenridge's prior work, there would have been more work for Questcor to do before consummating a deal.

**H. Glenridge Continues to Help Questcor With the Aventis Transaction**

39. Both before and after Questcor and Aventis agreed that Questcor would substitute for Glenridge in obtaining Acthar, Glenridge helped Questcor find acceptable potential manufacturers of Acthar. In addition, even after Questcor and Aventis agreed that Questcor would substitute for Glenridge in the Aventis deal, Glenridge via Dr. Rose continued to assist Questcor with formulating and implementing a manufacturing strategy that would allow Acthar to be profitably manufactured under terms that were acceptable to Aventis, NORD and the FDA.

40. Glenridge via Dr. Rose was also heavily involved in helping Questcor formulate and implement a manufacturing and regulatory strategy with the FDA. For example, Dr. Rose suggested that because the process and test methods required to manufacture Acthar could not be validated in the

10

manner that the FDA required at the time, Questcor should ask the FDA to waive the requirement. That turned out to be critical because no contractor would agree to run a process that could not be validated without an acknowledgment from the FDA that they would not be subject to regulatory action. Questcor was skeptical that the FDA would do as Dr. Rose suggested, but the FDA did agree, in writing, which was virtually unheard of at that time.

## I. Aventis Offers Questcor Essentially the Same Terms Negotiated by Glenridge

41. On July 27, 2001, thanks to Glenridge's work, Questcor and Aventis signed the Asset Purchase Agreement consummating Questcor's purchase of Acthar from Aventis. Pursuant to the Questcor / Aventis Asset Purchase Agreement, Questcor paid Aventis $100,000 plus a 1% royalty for all Acthar net sales over $10 million annually, and Aventis transferred to Questcor all rights to Acthar including ownership of the active NDA and all prior NDAs, and all equipment used in the manufacturing of the raw material for Acthar.

42. The key business terms of the Questcor / Aventis agreement were essentially the same as those negotiated by Glenridge before Questcor became involved. Questcor has admitted that, prior to Questcor's involvement, Aventis and Glenridge had negotiated the basic terms and conditions for the acquisition of Acthar by Glenridge.

43. Questcor and Glenridge both believed that the deal terms that Aventis accepted in principle with Glenridge, and that ultimately became the deal terms between Questcor and Aventis, were deal terms that would not have been available to Questcor had it approached Aventis without Glenridge's prior involvement. In other words, but for Glenridge, Questcor would have had to provide significantly more consideration to Aventis to acquire Acthar.

44. The deal terms that Glenridge made possible were critical for Questcor. At the time of the transaction with Aventis, Questcor was a small company with annual net sales of $3.3 million and annual net losses of $8.6 million. Questcor had an accumulated deficit of approximately $69.4 million.

Given those limited financial resources and the fact that it was agreeing to take over the difficult manufacturing process of a historically money-losing pharmaceutical product, it was important to Questcor that the Aventis agreement provide for limited up-front payments.

**J.    The Acquisition of Acthar Saves Questcor**

45.    Prior to signing the Aventis Asset Purchase Agreement, Questcor was in dire straits financially, planning to terminate all but nine of its employees, and intending to take drastic action in order to allow the company to survive, possibly including filing for bankruptcy. Questcor's management deemed the ability to acquire Acthar to be "critically important to the near term restructuring plan." Questcor told third parties that if Questcor could acquire Acthar, "we do not necessarily have to worry about not being able to survive."

46.    Just days after the Aventis Asset Purchase Agreement was signed, Questcor's CEO told the company that "[w]ith the acquisition of Acthar . . . we can seriously look toward the end of 2002 as the point in time when we will be break-even . . . . There are companies in the Bay Area going under every day. Not too long ago we all worried about that ourselves. I believe we are beyond that point now . . . ."

**K.    Questcor And Glenridge Negotiate the Terms of the Initial Royalty Agreement**

47.    Mr. Casamento negotiated the Royalty Agreement for Questcor. He had worked in the pharmaceutical industry since 1970, and had negotiated 70 or 80 contracts, including royalty agreements. Dr. Rose negotiated the Initial Royalty Agreement on behalf of Glenridge.

48.    On August 4, 2000, Glenridge confirmed in writing with Questcor the proposal for the Questcor / Glenridge royalty deal, including the contemplated 3% royalty. Questcor did not accept all of the terms proposed by Glenridge in August 2000. To the contrary, Questcor rejected Glenridge's proposal that Questcor pay (a) $300,000 in Questcor stock at the price per share at the date of closing of the transaction with Aventis; (b) one warrant for each two shares issued per the preceding clause, priced

at 1.3 times the per share price used in the preceding clause; and (c) a royalty of 3% of Net Sales of Acthar.

49. Following Questcor's rejection of Glenridge's August 2000 proposal, Glenridge dropped its request for Questcor equity securities and warrants, and proposed a royalty of 8% of Net Sales of Acthar. Questcor counter-proposed a royalty structure that would decrease over time, from 5%, to 4%, to 3% of Net Sales, "for so long as Questcor sells the Product" to which Glenridge agreed. By structuring the compensation as a royalty, Questcor was able to minimize its up-front cash payments at a time when it had limited access to capital and avoid the adverse financial accounting effects of issuing stock or warrants to Glenridge.

50. In negotiating the Asset Purchase Agreement with Aventis, and in negotiating the Royalty Agreement with Glenridge, Questcor was represented by Latham & Watkins and other attorneys. In addition, Questcor's Board of Directors was comprised of numerous attorneys. Conversely, Glenridge had no attorneys in its partnership and was not represented by any outside counsel.

51. On August 28, 2001, Glenridge asked Questcor to have Questcor's attorneys draft the formal Royalty Agreement. The negotiation between Dr. Rose and Questcor's attorneys then spanned such subjects as whether the royalty payment would expire after a term of years or last in perpetuity, to correcting typos.

52. On January 18, 2002, Glenridge and Questcor signed the Initial Royalty Agreement. Dr. Rose signed on behalf of Glenridge; Mr. Casamento signed on behalf of Questcor with full approval of the Questcor Board of Directors.

53. In 2007, Questcor imposed a massive price increase from about $1,600 per vial to about $23,000 per vial that contributed substantially to the profitability of the Acthar product. The Debtors have continued to hike up the price of Acthar such that the current Wholesale Acquisition Cost for a vial of Acthar Gel is $39,864.00.

### L. Glenridge v. Questcor Action

54. Questcor made all the quarterly royalty payments to the Glenridge Principals until around 2012. In 2011, Questcor changed how it was calculating its profits and the royalties due to the Glenridge Principals. As a result, Glenridge sued Questcor for breach of contract in California state court. On June 21, 2011, Glenridge initiated an action against Questcor in the Superior Court of California, Santa Clara County, captioned *Glenridge Pharmaceuticals LLC v. Questcor Pharmaceuticals, Inc., et al.*, Case No. 1-11-CV-203554 (the "Glenridge v. Questcor Action").

### M. Questcor v. Glenridge Action

55. In 2012, Questcor sued the Glenridge Principals to invalidate the Initial Royalty Agreement. On August 23, 2012, Questcor initiated an action against Glenridge and the Glenridge Principals in Superior Court of California, Orange County, captioned *Questcor Pharmaceuticals, Inc., v. Kenneth Greathouse, et al.,* Case No. 30-2012-00593348 (the "Questcor v. Glenridge Action").

### N. The Two Actions Were Consolidated.

56. On November 14, 2012, the Questcor v. Glenridge Action was transferred from Orange County to Santa Clara County, where it was assigned Case No. 1-12-CV-237225.

57. On August 23, 2013, the aforementioned Actions were consolidated into the matter *Glenridge Pharmaceuticals, LLC v. Questcor Pharmaceuticals, Inc., et al.,* Case No. 1-11-CV-203554 and consolidated with Case No. 1-12-CV-237225 (together with the aforementioned Glenridge v. Questcor Action and Questcor v. Glenridge Action, the "Litigation"). The parties in the Litigation engaged in discovery and non-dispositive motions, and were set to begin trial on November 3, 2014.

58. On August 14, 2014, Mallinckrodt plc completed its acquisition of Questcor.

**O.    The Parties Resolved Their Dispute.**

59.     On February 25, 2015, the Glenridge Principals[2] on the one hand, and Questcor and MPIL on the other hand, entered into a Confidential Settlement Agreement and Release (together with the Initial Royalty Agreement, the "Royalty Agreement") whereby MPIL or one of its "Affiliates" agreed to pay the Glenridge Principals quarterly royalty payments (the "Ongoing Royalty Payments") equal to 1.3% of certain net sales of the HP Acthar Gel product or other products marketed as set forth therein under the Royalty Agreement (collectively, the "Acthar Products"). The term of the Royalty Agreement did not expire until MPIL or one of its "Affiliates" had paid a total of $170 million in ongoing royalty payments to the Glenridge Principals, which has not been paid. The Royalty Agreement also provided the Glenridge Principals with annual audit rights and provided limitations on the assignment or transfer of MPIL's rights to sell the Acthar Products subject to the terms of the Royalty Agreement.

60.     If the Ongoing Royalty Payments were not paid timely to Plaintiffs in accordance with the terms of the Royalty Agreement, Plaintiffs were entitled to interest at an annual rate of the lesser of: (a) ten percent (10%) simple interest on all due and unpaid Ongoing Royalty Payments; or (b) the maximum interest rate permitted by applicable law; from the date such Ongoing Royalty Payment was due until it is paid. Plaintiffs received the Ongoing Royalty Payments through the first quarter of 2020, but have not received any Ongoing Royalty Payments thereafter. Defendants continue to accrue and account for the Ongoing Royalty Payments from the second quarter of 2020 to the present.

**P.    Acthar Is Debtors' Most Successful Product.**

61.     Over time, Acthar has more than realized the vast potential that the Glenridge Principals originally had foreseen in the Acthar product. MPIL and its "Affiliates" have enjoyed significant proceeds from sales of this extremely profitable product for more than 20 years.

---

[2] Prior to the entry into the Royalty Agreement, Glenridge assigned all rights in connection with the Initial Royalty Agreement and the Litigation to the Glenridge Principals. Glenridge was subsequently dissolved and operations wound up accordingly.

62. The Acthar Product is the Debtors' most successful pharmaceutical product, which, according to public resources, generated approximately $952 million in sales in 2019 after its acquisition from Questcor in 2014. The Debtors' most valuable product is Acthar which alone accounted for more in net sales than all of the Specialty Generics products combined. Notwithstanding the obligations and limitations on assigning or transferring their rights to receive proceeds from the sales of the Acthar Products, ARD receives all proceeds from the sales of the Acthar Products even though Defendants were obligated to ensure that ARD agreed in writing that it and any subsequent Transferee is bound by the terms of the Royalty Agreement.

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Judgment Under 11 U.S.C. § 2201
### (Against All Defendants)

63. Plaintiffs reallege paragraphs 1- 62 and incorporate all such allegations by reference as if they were set forth fully herein.

64. Plaintiffs are entitled to the Ongoing Royalty Payments, plus interest, which are held and continue to be held in constructive trust by Defendants. The Defendants dispute that Plaintiffs' Ongoing Royalty Payments are held in constructive trust.

65. Accordingly, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning the Ongoing Royalty Payments. This controversy is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

66. Pursuant to 28 U.S.C. § 2201, among other authorities, Plaintiffs are entitled to a declaratory judgment with regard to their rights, claims, title and interests arising under or related to the Ongoing Royalty Payments, including, without limitation, a judicial declaration that Defendants have held and continue to hold the Ongoing Royalty Payments in constructive trust for Plaintiffs in the amount of not less than $93 million plus applicable interest.

67. Pursuant to 28 U.S.C. § 2202, Plaintiffs are entitled to any "further necessary or proper relief" as may be warranted based on the Court's declaration of Plaintiffs' rights with regard to the Ongoing Royalty Payments.

## COUNT II
### Accounting
### (Against All Defendants)

68. Plaintiffs reallege paragraphs 1- 67 and incorporate all such allegations by reference as if they were set forth fully herein.

69. Defendants have not fully accounted for the Ongoing Royalty Payments received by them or their agents and assigns which were and continue to be wrongfully withheld and/or converted. As a result of the Defendants' wrongful withholding and/or conversion of the Ongoing Royalty Payments, including applicable interest, Plaintiffs have been unable to use or invest those Ongoing Royalty Payments.

70. As a result of Defendants' aforesaid wrongful acts and omissions, Plaintiffs have been injured and damaged and demand the equitable remedy of accounting.

## COUNT III
### Constructive Trust
### (Against All Defendants)

71. Plaintiffs reallege paragraphs 1- 70 and incorporate all such allegations by reference as if they were set forth fully herein.

72. Plaintiffs seek the imposition of a constructive trust over the Ongoing Royalty Payments owned by the Plaintiffs, plus applicable interest, in which Defendants have wrongfully withheld without legal or equitable justification thereby resulting in Defendants' substantial benefit, gain and/or profits derived from such unauthorized use of Plaintiff's Ongoing Royalty Payments.

73. Plaintiffs owned and continue to assert ownership interests in and to the Ongoing Royalty Payments.

74. Defendants have (i) wrongfully possessed, exercised control or dominion over and/or withheld Ongoing Royalty Payments; (ii) substantially interfered with Plaintiffs' use, investment and/or enjoyment of the Ongoing Royalty Payments by wrongfully preventing Plaintiffs from having access to such Ongoing Royalty Payments; (iii) refused to turn over the Ongoing Royalty Payments in response to Plaintiff's written demands without legal or equitable justification; and (iv) applied the Ongoing Royalty Payments for Defendants' use, benefit, gain and/or profits.

75. A constructive trust must be imposed to prevent the unjust enrichment of Defendants for the loss of use and the value of the Ongoing Royalty Payments. Through the actions alleged herein, Defendants have been unjustly enriched and benefited by the unlawful possession, exercise of control and/or retention of such Ongoing Royalty Payments and the benefits derived therefrom.

76. As a matter of equity, Defendants should be required to disgorge any and all benefits they have unjustly received, including the Ongoing Royalty Payments, plus applicable interest, resulting from the improper and unlawful conduct alleged herein and to reimburse Plaintiffs in an amount equal to said unjust enrichment.

## **COUNT IV**
**Conversion**
**(Against All Defendants)**

77. Plaintiffs reallege paragraphs 1- 76 and incorporate all such allegations by reference as if they were set forth fully herein.

78. Plaintiffs possessed (and continues to possess) an ownership interest in the Ongoing Royalty Payments as alleged herein at the time of Plaintiff's conversion.

79. Defendants willfully interfered with Plaintiff's rights to the Ongoing Royalty Payments by knowingly or intentionally possessing, exercising control or dominion over and/or withholding the Ongoing Royalty Payments and/or preventing Plaintiffs from having access to and use of such Ongoing Royalty Payments.

80. Plaintiffs did not consent to Defendants' use, possession and/or the wrongful dominion that Defendants exerted over the Ongoing Royalty Payments.

81. Defendant's unauthorized conversion of Plaintiff's Ongoing Royalty Payments caused substantial damages to Plaintiff, in an amount to be determined according to proof.

## COUNT V
### Unjust Enrichment
### (Against All Defendants)

82. Plaintiffs reallege paragraphs 1- 81 and incorporate all such allegations by reference as if they were set forth fully herein.

83. Defendants have wrongfully possessed, exercised control or dominion over and/or withheld the Ongoing Royalty Payments which rightfully belong to Plaintiffs.

84. Defendants have not filed any accounting to account for and/or pay to Plaintiffs the value of the Ongoing Royalty Payments, plus interest, and the profits derived therefrom.

85. As a direct and proximate result of Defendants' wrongful acts and omissions, Defendants have been unjustly enriched to the detriment of Plaintiffs.

86. Plaintiffs therefore demand restitution and judgment against Defendants in an amount to be determined at trial, together with interest, attorneys' fees, and the costs of this action.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

## PRAYER FOR RELIEF

a) For judgment to be entered in favor of Plaintiffs and against Defendants, and each of them, on all claims for relief, in an amount to be proven at trial;

b) For a declaratory judgment respecting Plaintiffs' rights, interests and ownership in and to the Ongoing Royalty Payments;

c) For an accounting by Defendants relating to any and all information related to the Defendants' use and possession of the Ongoing Royalty Payments, and any profits realized therefrom;

d) For the imposition of a constructive trust over the Ongoing Royalty Payments, including applicable interest;

e) For disgorgement of the Ongoing Royalty Payments, plus interest;

f) For costs of the suit and reasonable attorneys' fees; and

g) For such other and further relief as the Court deems just and proper.

Dated: October 6, 2021  
Wilmington, Delaware

/s/ *R. Grant Dick IV*  
R. Grant Dick IV (Del. No. 5123)  
**COOCH AND TAYLOR, P.A**  
The Nemours Building  
1007 N. Orange St., Suite 1120  
Wilmington, DE 19801  
Telephone: (302) 984-3867  
Facsimile: (302) 984-3939  
Email: gdick@coochtaylor.com

– and –

Lillian J. Stenfeldt (admitted *pro hac vice*)  
Phillip Wang (admitted *pro hac vice*)  
**RIMON, P.C.**  
423 Washington Street, Suite 600  
San Francisco, CA 94111  
Telephone: (415) 968-2002  
Facsimile: (415) 968-2002  
Email: lillian.stenfeldt@rimonlaw.com  
phillip.wang@rimonlaw.com

Jacquelyn H. Choi (admitted *pro hac vice*)  
**RIMON, P.C.**  
2029 Century Park East, Suite 400N  
Los Angeles, CA 90067  
Telephone: (310) 525-5859  
Facsimile: (310) 525-5859  
Email: jacquelyn.choi@rimonlaw.com

*Attorneys for Plaintiffs*  
*Kenneth R. Greathouse, Stuart Rose, and*  
*Lloyd Glenn*